## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America and the State of
Minnesota, ex rel. Ashley Mothershed,

Civil No. 22-602 (DWF/JFD)

        Plaintiffs,

v.

**MEMORANDUM
OPINION AND ORDER**

Mayo Clinic Ambulance,

        Defendant.

## INTRODUCTION

This matter is before the Court on Defendant Mayo Clinic Ambulance's ("Mayo")

motion to dismiss Relator Ashley Mothershed's second amended complaint. (Doc.

No. 74.) Relator opposes the motion. (Doc. No. 83.) For the reasons set forth below, the

motion is granted in part and denied in part.

## BACKGROUND

Mothershed is an experienced professional in ambulance coding compliance.

(Doc. No. 72, Second Am. Compl. ("SAC") ¶¶ 4, 15-21.) Mayo is a Minnesota-based,

non-profit organization that provides ambulance transport services in both Minnesota and

Wisconsin. (*Id.* ¶¶ 25-26.) In November 2020, Mothershed began working remotely for

Mayo's billing department. (*Id.* ¶¶ 12-14.) She worked for Mayo from November 2020

through June 2021, and then again from September 2021 through May 2022. (*Id.*

¶¶ 12, 14.) As a biller in Mayo's billing department, Mothershed used information from

patient care reports to enter appropriate billing codes into Mayo's RescueNet billing software.  (*Id.* ¶¶ 40, 133.)  The information from RescueNet was first reviewed by Mayo's billing supervisors and then automatically inputted into the appropriate form for submission to a government healthcare payor for reimbursement.  (*Id.* ¶¶ 40, 135, 138.)  During her time with Mayo, Mothershed noticed that Mayo had a practice of submitting allegedly false claims to federal and Minnesota-state healthcare payors.  (*Id.* ¶ 2.)  Mothershed frequently reported the improper billing practices to her supervisors, but they would tell her she was wrong and instruct her to continue billing in the same manner.  (*Id.* ¶ 42.)  On one occasion, Mothershed's supervisor warned her to "drop her complaints or else."  (*Id.* ¶ 143.)  Similarly, one of Mothershed's coworkers also raised concerns about false billing practices and received similar push back from their supervisors.  (*Id.* ¶ 146.)

Ambulance services providers may seek reimbursement from federal or Minnesota-state healthcare payors so long as (1) the transport was medically necessary, meaning that "the use of other methods of transportation is contraindicated by the individual's condition," (2) they use the Centers for Medicare and Medicaid Services' ("CMS") billing codes, and (3) the billing code reflects the level of service that was actually provided.  42 U.S.C. § 1395x(s)(7); 42 C.F.R. §§ 410.40(e)(1), 410.41(c); *see also* CMS, Pub. No. 100-02, *Medicare Benefit Policy Manual*, ch. 10, §§ 10.2, 10.2.2 (2018), https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/bp102c10.pdf.[1]

---

[1]    Minnesota's Medical Assistance program follows the Medicare criteria for reimbursement of ambulance services.  Minn. Stat. § 256B.0625, subdiv. 17a(a).  The

Mothershed alleges that Mayo had three schemes for submitting false claims: (1) failing to review whether ambulance transports were medically necessary; (2) inaccurately reporting the level of services provided by upcoding non-emergency transports to emergency transports; and (3) inaccurately reporting the level of services provided by upcoding basic life support ("BLS") services to advanced life support ("ALS") services.  (SAC ¶ 2.)  The Court describes each of these alleged schemes and the applicable regulations in further detail below.

## I.    Alleged Scheme 1:  Failure to Consider Medical Necessity

Government healthcare payors only reimburse ambulance transports that are medically necessary, meaning that "the use of other methods of transportation is contraindicated by the individual's condition."  42 U.S.C. § 1395x(s)(7).  Other methods of transportation are not contraindicated if "some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such other transportation is actually available."  CMS, Pub. No. 100-02, *Medicare Benefit Policy Manual*, ch. 10, § 10.2.1 (2018).  Medical necessity is presumed when the patient was transported in an emergent situation (such as an accident, injury, or acute illness),

---

TRICARE/CHAMPUS and Federal Employees' Health Benefits programs also have similar requirements to Medicare.  *See* 32 C.F.R. §§ 199.2, 199.4(d)(3)(v); Off. of Pers. Mgmt., *Frequently Questioned Services*, https://www.opm.gov/retirement-center/publications-forms/benefits-administration-letters/2017/17-401a3.pdf (last visited Jan. 13, 2025).  Given the similarities, the parties have primarily referred to the Medicare requirements throughout their filings.  The Court does the same for the purposes of this motion.

was unconscious, required emergency treatment during transport, or was bed-confined before and after the transport.  *Id.* § 20.

If a provider submits a claim to a government healthcare payor,[2] they must determine whether the transport was medically necessary.  CMS, Pub. No. 100-04, *Medicare Claims Processing Manual*, ch. 15, § 30.2.4 (2024), https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c15.pdf.  When a transport was not medically necessary, the provider must include a "GY" modifier with the billing code.  *Id.*  If a GY modifier is used, the government healthcare payor will deny the claim.  *Id.*  Consequently, the ambulance entity must seek reimbursement from the patient or the patient's private insurance.  *Id.*

Mothershed alleges that Mayo's general practice was to not review medical necessity, instead leaving the default billing assumption that transports were medically necessary.  (SAC ¶¶ 69, 73, 76.)  During training, Mothershed was told by her trainer that Mayo did not use GY modifiers.  (*Id.* ¶ 78.)  When Mothershed asked her trainer and a supervisor if they had ever determined that a transport was not medically necessary, they each said they had not.  (*Id.* ¶ 79.)  Mothershed repeatedly confronted her supervisors about this practice and each time was told that Mayo did not review medical necessity.  (*Id.* ¶¶ 81-84, 95.)  Mothershed was once instructed to add the GY modifier to a transport

---

[2]    Providers do not have to submit claims to government healthcare payors for services that are excluded under the statute.  CMS, Pub. No. 100-04, *Medicare Claims Process Manual*, ch. 15, § 30.2.4 (2024).  When they choose to submit such claims to a government healthcare payor, they must use the GY modifier.

at the instruction of her supervisor because the patient specifically requested it. (*Id.*
¶ 77 n.5; *see also* Doc. No. 78 ("Sertich Decl.") ¶ 17, Ex. 16.)

Mothershed provides four specific examples of this practice. Patient MN-2 was
transported to the hospital by Mayo after a 911 call. (Sertich Decl. ¶ 4, Ex. 3 at 2.) The
patient had tripped and fallen the previous day and reported back pain. (*Id.* at 4.) She
was alert, oriented, and able to stand and walk. (*Id.* at 4-5.) She was legally blind and
reported that her caretaker had left for the weekend. (*Id.* at 4.) Mayo billed the transport
without the GY modifier, indicating that it was medically necessary. (SAC ¶ 88.)

Patient MN-6 was transported to the hospital by Mayo after a 911 call. (Sertich
Decl. ¶ 5, Ex. 4 at 2.) The patient had visited Mayo Clinic earlier that day, but after
returning home she began experiencing weakness and confusion and was unable to leave
her wheelchair. (*Id.* at 4.) Her husband requested that she be transported to the hospital.
(*Id.*) She did not receive any treatment while being transported and was simply taken to
the hospital for further evaluation and treatment. (*Id.*) Mayo billed the transport without
the GY modifier, indicating that it was medically necessary. (SAC ¶ 89.)

Patient MN-7 was transported to the hospital by Mayo after a 911 call. (Sertich
Decl. ¶ 6, Ex. 5 at 2.) When the ambulance team arrived, the patient was intoxicated and
rolling a cigarette. (*Id.* at 5.) The patient reported that he had been assaulted three times,
although he was uncooperative and did not indicate when he was assaulted. (*Id.*) He did
not appear to be in any acute distress or have any signs of bleeding or other trauma. (*Id.*)
He also reported that he had no medical issues but that he wanted to be transported to the

hospital.  (*Id.*)  Mayo billed the transport without the GY modifier, indicating that it was medically necessary.  (SAC ¶ 90.)

Patient MN-8 was transported to the hospital by Mayo after a 911 call.  (Sertich Decl. ¶ 7, Ex. 6 ("MN-8 R.") at 2.)  The patient had visited the hospital for routine tests earlier that morning.  (*Id.* at 4.)  The patient returned home to wait for the results.  (*Id.*)  When the results came back, they showed that the patient had low hemoglobin, so his doctor told the patient to go to the Emergency Department.  (*Id.*)  The patient was not experiencing pain at the time of transport.  (*Id.*)  He had no bleeding and was vitally stable, alert, and oriented.  (*Id.*)  Mayo billed the transport without the GY modifier, indicating that it was medically necessary.  (SAC ¶ 93.)

## II.    Alleged Scheme 2:  Upcoding Non-Emergency Transports to Emergency

When submitting claims, providers must report whether a transport was emergency or non-emergency.  Emergency transports are reimbursed by government healthcare payors at a higher rate than non-emergency transports.  *See* 42 C.F.R. § 414.610(c).  A transport qualifies as an emergency response when the ambulance entity "respond[s] immediately at the BLS or ALS1 level of service to a 911 call or the equivalent in areas without a 911 call system."  *Id.* § 414.605.  "An immediate response is one in which the ambulance entity begins as quickly as possible to take the steps necessary to respond to the call."  *Id.*  A 911 call is not required to meet the second requirement, even in areas with a 911 system.  CMS, Pub. No. 100-02, *Medicare Benefit Policy Manual*, ch. 10, § 30.1.1 (2018).  Instead, the phrase "is intended to establish the standard that the nature of the call at the time of dispatch is the determining factor."  *Id.*

A call is an emergency "when, based on the information available to the dispatcher at the time of the call, it is reasonable for the dispatcher to issue an emergency dispatch in light of accepted, standard dispatch protocol." *Id.*

Mothershed alleges that Mayo had a general practice of billing non-emergency calls as emergency solely because an ambulance was dispatched immediately after receiving a call. (SAC ¶¶ 47-48.) She specifically focuses on Mayo's practice of upcoding scheduled hospital-to-hospital transfers to emergencies. (*Id.* ¶¶ 47, 50-51.) Mothershed was repeatedly instructed to bill this way, despite various conversations she had with her supervisors about the practice. (*Id.* ¶¶ 59-63, 142, 154-57.) For example, Mothershed was instructed by Mayo's Regulatory Officer Tom Fennell to incorrectly bill a patient transport to dialysis as an emergency transport. (*Id.* ¶ 61.) When she coded non-emergency transports in accordance with her understanding of the regulations, she was later forced to change the codes to emergency by her supervisors. (*Id.* ¶ 62.) She was also directed to follow this practice at the billing department's weekly Skype meetings. (*Id.* ¶¶ 60, 63.)

Mothershed provides three specific examples of this practice. Patient DP-1 was transferred by Mayo from one hospital to another for a hematology consult. (Sertich Decl. ¶ 11, Ex. 10 ("DP-1 R.") at 6.) The transport was a scheduled transfer and marked as "No lights & sirens" in the report. (*Id.* at 2; SAC ¶ 65.) Just over one hour passed between the time the call was received and when the call was assigned to a transport team. (DP-1 R. at 2.) The patient's chart did not otherwise indicate any emergency or

urgency of the call.  (SAC ¶ 65; *see* DP-1 R. at 6.)  The transport was ultimately billed by Mayo as an emergency transport.  (SAC ¶ 65.)

Patient DP-2 was transferred by Mayo from one hospital to another because the first facility did not have an available room.  (Sertich Decl. ¶ 12, Ex. 11 ("DP-2 R.") at 5.)  The patient was suffering from congestive heart failure and COPD.  (*Id.*)  The transport was a scheduled transfer and marked as "No lights & sirens."  (*Id.* at 2; SAC ¶ 66.)  No symptoms were noted and the EMTs made no inquiry about the patient's symptoms during the transport.  (SAC ¶ 66.)  While only two minutes passed between the time the call was received and when the call was assigned, the ambulance team arrived at the first hospital just over fifty minutes after the call was originally received.  (DP-2 R. at 2.)

Patient DP-3 was transferred by Mayo from one hospital to another for an endoscopic retrograde cholangiopancreatography requested by her physician, a procedure that examines a patient's pancreatic and bile ducts.  (Sertich Decl. ¶ 13, Ex. 12 ("DP-3 R.") at 4; SAC ¶ 67.)  The patient did not report any pain at the time of transport. (DP-3 R. at 4.)  The transport was a scheduled transfer and marked as "No lights & sirens."  (*Id.* at 2; SAC ¶ 67.)  Only ten minutes passed between the time the call was received and when the call was assigned.  (DP-3 R. at 2.)  The ambulance team arrived at the first hospital about an hour and thirty minutes after the call was originally received. (*Id.*)

### III.   Alleged Scheme 3:  Upcoding BLS Services to ALS Services

When submitting claims, providers report the nature of the services provided, which are typically either BLS or ALS.  ALS services are reimbursed by government healthcare payors at a higher rate than BLS services.  *See* 42 C.F.R. § 414.610(c).  BLS services are a lower tier of services, defined in the regulations as "transportation by ground ambulance vehicle and medically necessary supplies and services, plus the provision of BLS ambulance services."  *Id.* § 414.605.  In contrast, ALS, level 1 services are "transportation by ground ambulance vehicle, medically necessary supplies and services and either an ALS assessment by ALS personnel or the provision of at least one ALS intervention."  *Id.*  Thus, to bill for ALS, level 1 services, ALS personnel must perform either an ALS assessment or intervention in response to the call.

An ALS assessment "is an assessment performed by an ALS crew as part of an emergency response that was necessary because the patient's reported condition at the time of dispatch was such that only an ALS crew was qualified to perform the assessment."  *Id.*  An ALS intervention is "a procedure that is, in accordance with State and local laws, required to be furnished by ALS personnel."  *Id.*  Only ALS personnel may conduct an ALS assessment or intervention.  *Id.*; *see also* CMS, Pub. No. 100-02, *Medicare Benefit Policy Manual*, ch. 10, § 30.1.1 (2018).  Only individuals trained at the EMT-Intermediate and Paramedic levels qualify as ALS personnel.  42 C.F.R. § 414.605.  Notably, this definition excludes individuals trained at the EMT-Basic level.  To qualify as an ALS crew, an ambulance team only needs one ALS-qualified member.  CMS, Pub.

No. 100-02, *Medicare Benefit Policy Manual*, ch. 10, § 10.1.2 (2018). Thus, an ALS crew could consist of one EMT-Intermediate or Paramedic and one EMT-Basic.

Mothershed alleges that Mayo had a general practice of billing BLS services as ALS services. (SAC ¶¶ 120, 124.) Specifically, Mayo would bill services as ALS when an ALS crew responded to the call, even though no ALS assessment or intervention was conducted. (*Id.* ¶¶ 126-28.)

Mothershed provides two specific examples of this practice. Patient LS-3 was suffering from diarrhea, abdominal pain, nausea, and vomiting. (Sertich Decl. ¶ 9, Ex. 8 at 5.) An ALS crew was dispatched to respond to the call, consisting of one Paramedic and one EMT-Basic. (*Id.* at 2.) Dispatch marked the call type as "BLS." (*Id.*) Upon arriving at the scene, the EMT-Basic performed an assessment of the patient.[3] (*Id.* at 3.) No ALS interventions were conducted during the call. (*Id.* at 4-5; SAC ¶ 126.) Mayo billed the transport as ALS instead of BLS. (SAC ¶ 126.)

Patient LS-5 was found on the floor not making sense and reported experiencing weakness. (Sertich Decl. ¶ 10, Ex. 9 at 5.) An ALS crew was dispatched to respond to the call, consisting of one Paramedic and one EMT-Basic. (*Id.* at 2.) Dispatch marked the call type as "BLS." (*Id.*) Upon arriving at the scene, the EMT-Basic performed an

---

[3]     Mayo contends that it is inappropriate for the Court to infer from the records that an EMT-Basic conducted the assessment when an assessment is listed as "By" an EMT-Basic. (Doc. No. 84 at 29.) Further, Mayo asks the Court to infer the opposite: that the crew member listed after "By" is only the one who documented the services, not the one who performed the services. (*Id.*) The Court rejects this argument. All inferences must be drawn in the light most favorable to the complainant at this stage. The inference that an EMT-Basic conducted the assessment is a reasonable inference based on the facts.

assessment of the patient.  (*Id.* at 3.)  No ALS interventions were conducted during the

call.  (*Id.* at 4-5; SAC ¶ 127.)  Mayo billed the transport as ALS instead of BLS.  (SAC

¶ 127.)

## IV.    This Case

Mothershed brings this *qui tam* action on behalf of the United States of America

and the State of Minnesota against Mayo under the federal False Claims Act ("FCA") and

the Minnesota False Claims Act ("MFCA").  (SAC ¶ 1.)  She brings four counts, two

under the FCA and two under the MFCA,[4] all based on the three schemes outlined above.

The United States of America and the State of Minnesota declined to intervene in this

action.  (Doc. No. 25.)  Mayo now moves to dismiss Mothershed's second amended

complaint under Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 74.)

## DISCUSSION

## I.    Legal Standard

### A.    Motion to Dismiss Under Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), a court assumes all facts in the complaint to be true and construes all

reasonable inferences from those facts in the light most favorable to the complainant.

*Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need

not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview*

---

[4]    Because the MFCA mirrors the FCA, the Court analyzes all counts under the FCA.
*See Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1069 n.6 (8th Cir. 2016).
Count 3 mirrors Count 1, so the Court analyzes them together.  Count 4 mirrors Count 2,
so the Court analyzes them together.

*Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader

from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). Although a complaint need not contain "detailed factual allegations," it must

contain facts with enough specificity "to raise a right to relief above the speculative

level." *Id.* at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements

of a cause of action, supported by mere conclusory statements," will not pass muster

under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S.

at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation

that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

A court may consider the complaint, matters of public record, orders, materials

embraced by the complaint, and exhibits attached to the complaint in deciding a motion

to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079

(8th Cir. 1999). The parties disagree about the scope of this rule. Generally, "materials

embraced by the complaint include 'documents whose contents are alleged in a complaint

and whose authenticity no party questions, but which are not physically attached to the

pleadings.'" *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quoting

*Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)). This includes

matters that are "integral to the claim." *Miller v. Redwood Toxicology Lab., Inc.*,

688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R.

Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)). The Court finds that all

patient records and email communications described or alluded to in the complaint are embraced by the complaint. The Court may rely upon these records as it sees fit without converting this motion into a motion for summary judgment.

### B.    Pleading Standard Under Rule 9(b)

In addition, because Mothershed brings her claims under the FCA, her complaint must meet the heightened pleading standard under Rule 9(b). *United States ex rel. Dunn v. N. Mem'l Health Care*, 739 F.3d 417, 419-20 (8th Cir. 2014). Rule 9(b) requires that a party pleading fraud or mistake do so with "particularity." This heightened pleading standard does not extend to mental conditions such as intent or knowledge. Fed. R. Civ. P. 9(b). Instead, mental conditions "may be alleged generally." *Id.*

To satisfy Rule 9(b), a complaint must plead the "who, what, when, where, and how" of the alleged fraud. *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (8th Cir. 2013) (quoting *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011)). When a complaint alleges a systematic practice under the FCA, as Mothershed has in this case, there are two ways in which a relator can meet this standard. The traditional method is pleading "*some* representative examples of [the defendant's] alleged fraudulent conduct, specifying the time, place, and content of [the defendant's] acts and the identity of the actors." *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 917 (8th Cir. 2014) (alterations in original) (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006)). Under the second method, as described in *Thayer*, "a relator can satisfy Rule 9(b) by 'alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong

inference that claims were actually submitted.'" *Id.* (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).  The *Thayer* method applies to a narrow category of cases where the relator can show familiarity with particular details of the alleged scheme.  *Id.*

The parties disagree about whether Mothershed should be allowed to plead under the *second* method.  In *Thayer*, the relator alleged that Planned Parenthood was submitting false or fraudulent claims for Medicaid reimbursement.  *Id.* at 915.  The relator was the manager of two of Planned Parenthood's clinics and oversaw its billings and claims system.  *Id.* at 917.  In her complaint, the relator pleaded her firsthand knowledge of the schemes as someone with access to the billing system, including "names of the individuals that instructed her to carry out these schemes," the period during which the schemes took place, participating clinics, and the "methods by which these schemes were perpetrated."  *Id.* at 919.  Therefore, the Eighth Circuit found sufficient indicia of reliability to allow the relator to plead by showing particular details of the alleged scheme rather than providing representative examples.  *Id.*

Here, Mothershed's position is directly analogous to the relator in *Thayer*.  She worked in Mayo's billing department, she was familiar with its billing practices, and she alleged particular details of the schemes based on her firsthand experience.  Thus, the Court concludes that Mothershed can meet the Rule 9(b) pleading standard either by pleading representative examples or particular details of each alleged scheme supported by sufficient indicia of reliability.

## II.    Counts 1 and 3

To prove a claim under 31 U.S.C. § 3729(a)(1)(A), a party must show:  "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."  *Olson*, 831 F.3d at 1070 (quoting *United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 803 (8th Cir. 2001)). The knowledge element may be met by showing that a person (1) "has actual knowledge of the information," (2) "acts in deliberate ignorance of the truth or falsity of the information," or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  Deliberate ignorance covers "defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statements' truth or falsity."  *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023).  Reckless disregard covers "defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway."  *Id.*  The knowledge element does not require proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1)(B).

There are two categories of falsity under the FCA:  factually false and legally false.  *Olson v. Fairview Health Servs. of Minn.*, No. 13-cv-2607, 2015 WL 1189823, at *7 (D. Minn. Mar. 16, 2015).  Factually false claims are those where the defendant submits "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  *Id.* (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)).  Legally false claims are those "where a party certifies compliance with a statute or regulation as a condition to governmental payment."  *Id.*

at *8 (quoting *Mikes*, 274 F.3d at 697). This kind of false certification can be express or implied. *Id.* Mothershed's three theories appear to fit into the factually false category. (*See* SAC ¶¶ 6, 218, 236.)

Mayo argues that Mothershed's claims under this section of the FCA and MFCA fail because she did not sufficiently allege the falsity element or the knowledge element for any of the three alleged schemes. (Doc. No. 84 at 8-9, 18.) The Court addresses this argument for each scheme below.

## A.    Failure to Consider Medical Necessity

Mothershed alleges first that Mayo had a general practice of failing to review ambulance transports for medical necessity, and as a result, Mayo submitted many transports to government healthcare payors for reimbursement that were not eligible for reimbursement. Mothershed provides four representative examples of this practice and alleges the scheme based on her own particular knowledge.

Starting with falsity, Mayo argues that Mothershed's representative examples do not demonstrate falsity because they all involve situations where ambulance transport is presumed to be medically necessary. (Doc. No. 84 at 20.) Each example Mothershed provided involves a 911 call where the patient was experiencing some kind of injury or acute illness, all situations where medical necessity is presumed under CMS guidance. Patient MN-2 had suffered a back injury the previous day and reported pain resulting from that injury. Patient MN-6 was experiencing weakness and confusion, and was unable to leave her wheelchair, which would qualify as an acute illness. Patient MN-7 indicated that he had been assaulted, which would qualify as an injury or accident.

16

Patient MN-8 was experiencing low hemoglobin and needed to go to the emergency department, which would qualify as an acute illness. Although these examples are not the strongest showings of medical necessity, they appear to meet the presumption in CMS guidance. Because these examples do not demonstrate that Mayo submitted transports that were not medically necessary as medically necessary (i.e. without the GY modifier), Mothershed has not sufficiently alleged falsity through her representative examples.

Mothershed could also plead details of the scheme based on her personal knowledge, but again, the pleading falls short of sufficiently alleging falsity. Mothershed alleges a general practice of failing to consider medical necessity. This practice of failing to do something misses a logical step. To show falsity under this kind of theory, a relator must demonstrate that the defendant is submitting an incorrect description of goods or services. Mothershed shows that Mayo does not review for medical necessity, but she does not make a final connection between that practice and false claims being submitted to the government. As the CMS guidance explains, not all claims are submitted to government healthcare payors, so it does not follow that failure to review for medical necessity resulted in false claims being submitted to government healthcare payors. Furthermore, the email discussion Mothershed describes—which Mayo provided—demonstrates that Mayo was familiar with the modifier and using it in instances where a patient asked Mayo to submit a claim to Medicare that Medicare should not reimburse. Falsity must be pleaded with particularity, and this is not enough for the Court to conclude on the falsity element.

Upon finding that Mothershed has not sufficiently pleaded the falsity element, the Court does not further address the knowledge element. Mayo's motion to dismiss is granted as to this theory. The theory is dismissed without prejudice.

**B.    Upcoding Non-Emergency Transports to Emergency**

Mothershed alleges second that Mayo upcoded non-emergency transports to emergency transports, and as a result, government healthcare payors reimbursed Mayo at a higher rate. An emergency transport requires two things: (1) an immediate response; and (2) a 911 call or the equivalent. Mothershed offered three representative examples as well as detailed allegations based on her personal experience. The three representative examples are sufficient to allege falsity. In each of these examples, the patient was transferred from one hospital to another. The transfers were scheduled and marked as "No lights & sirens." Mayo appears to have relied on the "immediate response" portion of this definition to justify marking the transfers as emergency. While a few of these examples were within the time range that could be considered immediate, that is not the only requirement. The second requirement revolves around the nature of the call at the time of dispatch. For all three of the representative examples, the nature of the call was marked as scheduled and no lights or sirens were recommended. Viewing the facts in the light most favorable to Mothershed, by indicating that non-emergency transports were emergency transports, Mayo submitted claims for reimbursement that had an incorrect description of the services. Thus, Mothershed sufficiently alleges falsity.

As for knowledge, Mothershed alleges many conversations with her supervisors at Mayo about the problems with this billing practice. Her supervisors ignored her

suggestions and told her to keep billing this way, even at times telling her to go back and change her codes.  These actions demonstrate, at a minimum, a reckless disregard because Mayo was aware of the substantial and unjustifiable risk that they might have been submitting false claims, but they ignored those warnings by Mothershed.  Thus, Mothershed sufficiently alleges knowledge.

### C.    Upcoding BLS Services to ALS Services

Mothershed alleges third that Mayo upcoded BLS services to ALS services, and as a result, government healthcare payors reimbursed Mayo at a higher rate.  ALS services may be billed when ALS personnel perform either an ALS assessment or an ALS intervention.  Mothershed offered two representative examples where no ALS assessment or intervention was performed but Mayo still billed ALS services.  Specifically, an assessment was conducted by an EMT-Basic, which would be considered a BLS assessment, and no separate ALS intervention was performed.  Without an ALS assessment or intervention, these transports should have been submitted as BLS services and reimbursed at a lower rate.  Mothershed has sufficiently alleged falsity under Rule 9(b).

As for knowledge, Mothershed has shown that Mayo's supervisors reviewed these claims and that she repeatedly confronted them about the false billing practices.  As described above, this demonstrates at least reckless disregard because Mayo was aware of the substantial and unjustifiable risk that they might have been submitting false claims, but they ignored Mothershed's warnings.  Mothershed has sufficiently alleged knowledge.

### III.   Counts 2 and 4

To prove a claim under 31 U.S.C. § 3729(a)(1)(B), a party must show: "(1) the defendant made a 'false record or statement'; (2) the defendant knew the statement was false; (3) the statement was material; and (4) the defendant made a 'claim' for the government to pay money or forfeit money due." *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 500 (8th Cir. 2016). A claim under this section of the FCA differs from the previous section because it requires the making of a false statement or record that is subsequently submitted as part of a false claim.

Mayo argues that Mothershed's claims under this section of the FCA and MFCA fail for the same reasons as Counts 1 and 3, but also because Mothershed did not sufficiently allege the existence of a separate "false record or statement" and these counts are entirely duplicative of Counts 1 and 3. (Doc. No. 84 at 8-9.) The Court agrees that Mothershed fails to sufficiently allege a separate false record or statement and, moreover, Counts 2 and 4 are completely duplicative of Counts 1 and 3.

The "false record or statement" requirement of § 3729(a)(1)(B) means that there is a separate false record or statement that is distinct from the false claim itself. *See, e.g.*, *United States ex rel. Oliver v. Parsons Corp.*, 498 F. Supp. 2d 1260, 1278 n.20 (C.D. Cal. 2006); *see also United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1166 (8th Cir. 2019) (describing that there must be a connection between the false record or statement and the false claim made to the government). Mothershed does not particularly allege what the separate false record or statements would be in this case, and instead makes general statements that the billing forms count as false records or

20

statements, as well as "false supporting materials," "internal billing forms," and "false certifications." (*See* SAC ¶¶ 229, 233.) The billing forms submitted to government healthcare payors for reimbursement are the false claims themselves, so Mothershed must allege, with particularity, a separate false record or statement. She does not explain what she means by supporting materials or false certifications. Internal billing forms could perhaps refer to the RescueNet software, however, she does not make this clear. This is not sufficient pleading under Rule 9(b).

Furthermore, these two counts are entirely duplicative of Counts 1 and 3. The D.C. Circuit has explained that § 3729(a)(1)(B) is "designed to prevent those who make false records or statements to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004); *see also United States ex rel. Brooks v. Stevens-Henager Coll.*, 305 F. Supp. 3d 1279, 1305-06 (D. Utah 2018) ("The primary purpose of § 3729(a)(1)(B) is to remove any defense that the defendant did not personally submit, or cause to be submitted, a false claim for payment."). Mothershed has not alleged any facts suggesting that Mayo could escape liability under § 3729(a)(1)(A) through this type of defense. Therefore, the Court finds that Counts 2 and 4 are entirely duplicative and dismisses them without prejudice.

## ORDER

Based upon the foregoing and the record in this case, **IT IS HEREBY ORDERED** that Defendant Mayo Clinic Ambulance's motion to dismiss (Doc. No. [74]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

21

1.     Defendant's motion is **GRANTED** as to Counts 2 and 4 of the Second Amended Complaint.

2.     Counts 2 and 4 of the Second Amended Complaint are **DISMISSED WITHOUT PREJUDICE**.

3.     Defendant's motion is **GRANTED** as to Counts 1 and 3 under a theory of falsity on medical necessity.

4.     Defendant's motion is otherwise **DENIED**.  Counts 1 and 3 remain in this action based on Relator's other two theories.

Dated:  January 24, 2025                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge