**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| United States of America and State of Minnesota *ex rel.* Ashley Mothershed, | Case No. 22-cv-602 (DWF/JFD) |
| Plaintiff-Relator, | |
| v. | **ORDER** |
| Mayo Clinic Ambulance, | |
| Defendant. | |

---

This matter is before the Court on Plaintiff-Relator Ashley Mothershed's Second Motion to Compel Documents (Dkt. No. 133). The Court heard the motion on June 9, 2026. Grace Chanin and Rebekah Bailey, Esqs., appeared on behalf of Plaintiff-Relator Ashley Mothershed. Manda Sertich and Rachel Dougherty, Esqs., appeared on behalf of Mayo Clinic Ambulance. As set forth fully below, the Court denies the motion in part and keeps it under advisement in part.

## I.     Background

Ms. Mothershed worked for Mayo Clinic Ambulance ("Mayo") in its billing department from about November 2020 through June 2021 and again from about September 2021 through May 2022. She initiated this *qui tam* action after learning that Mayo was submitting allegedly false claims for ambulance transports to government healthcare payors, in violation of the federal and Minnesota False Claims Acts.

A.      **Ambulance Transport Billing**

The Centers for Medicare and Medicaid Services ("CMS") administers the Medicare and Medicaid programs, which are government healthcare payors for many healthcare services, including ambulance transports. (*See* Second Amended Complaint ("SAC") ¶ 23, Dkt. No. 72.) Claims submitted for payment must use CMS-designated procedure codes, such as the Healthcare Common Procedure Coding System ("HCPCS"). (*See* Def.'s Mem. Opp'n 1st Mot. Compel at 3 (citing 42 C.F.R. § 410.41(c)), Dkt. No. 116; SAC ¶¶ 35–38.) Relevant to the ambulance transports at issue in this case are four HCPCS codes determined by a pair of questions. The first question is whether Advanced Life Support ("ALS") or Basic Life Support ("BLS") services were provided. The second question is whether the transport was an emergency or a non-emergency. (*See* SAC ¶ 38.) Billing for ALS (rather than BLS) and billing for emergency (rather than non-emergency) transport allow for reimbursement at a higher rate. (*See id.* ¶¶ 5, 36.)

BLS services require that the ambulance vehicle is staffed by two people, at least one of whom is an emergency medical technician-basic ("EMT-Basic"). (*Id.* ¶ 97.) The lowest level of emergency medical service certification is Emergency Medical Responder ("EMR"). (*Id.* ¶ 100.) Proceeding in the degree of training required and complexity of service rendered beyond EMR is EMT-Basic, followed by EMT-Intermediate (also referred to as EMT-Advanced), and EMT-Paramedic, the highest level. (*Id.* ¶¶ 97–100.)

ALS services are reimbursed at a higher rate by government payors than BLS services. (Order at 9, Jan. 24, 2025, Dkt. No. 91 ("Dismissal Order") (citing 42 C.F.R. § 414.610(c)).) For a transport to be billed as ALS instead of BLS, an ALS assessment or

an ALS intervention must be performed. (SAC ¶ 98 (quoting CMS, *Medicare Benefit Policy Manual*, Pub. No. 100-02, ch. 10, § 30.1.1 (2018)).) An ALS assessment must be performed by an ALS crew and necessitated by the patient's reported condition at the time of dispatch. (*Id.*) If the ALS crew performs an ALS assessment, the services are covered at the ALS emergency level regardless of whether the patient required an ALS intervention, as long as the ambulance transport was medically reasonable and necessary. (*Id.*) An ALS intervention is a medically necessary procedure that must be performed by an EMT-Advanced or EMT-Paramedic. (*Id.*)

An emergency transport is reimbursed at a higher rate than a non-emergency transport. (Dismissal Order at 6 (citing 42 C.F.R. § 414.610(c)).) When a responding ambulance responds immediately, it may qualify as an emergency transport. (*Id.* at 6 (citing 42 C.F.R. § 414.605).) Responding immediately is when the ambulance "begins as quickly as possible to take the steps necessary to respond to the call." (*Id.* (quoting 42 C.F.R. § 414.605).) The information available at the time of the dispatch determines whether a call is an emergency. (*Id.* at 7 (citing CMS, *Medicare Benefit Policy Manual*, ch. 10, § 30.1.1).)

In determining how to bill for services, organizations such as Mayo rely in part on the patient care report ("PCR"), which describes the treatment and care provided to the patient during transport. (SAC ¶ 86 & n.7.) The PCR includes information provided to the dispatcher and information gathered during the interaction with the patient. (*Id.* ¶ 86 n.7.) Mayo also relies on the Medical Priority Dispatch System ("MPDS") records for each transport. (Dougherty Decl. Ex. 3 (Dostal Dep. at 18–19), Dkt. No. 143-3.) MPDS is a

system to help dispatchers assess how to appropriately respond to an incoming call, which can correspond to the required ALS level of services. (*Id.* at 45, 55–57, 60–61, 194–195.) The software version of MPDS is called ProQA; the non-software version is a physical card set, similar to a flipbook. (*Id.* at 18.)

### B.    Procedural History

Ms. Mothershed alleged in the SAC that Mayo engaged in three fraudulent schemes: (1) billing for medically unnecessary ambulance transports, (2) upcoding non-emergency ambulance transports to emergency transports, and (3) upcoding BLS ambulance transports to ALS transports. (*See* SAC ¶ 2; Dismissal Order at 3.) United States District Judge Donovan W. Frank dismissed the medical-necessity theory on Mayo's motion. (Dismissal Order at 18.) The two upcoding theories remain in the case.

Ms. Mothershed brought her first motion to compel discovery at the beginning of fact discovery, in July 2025. This Court determined in a written order that the temporal scope of discovery was from November 1, 2018 through March 8, 2022. (Order at 14, Oct. 31, 2025, Dkt. No. 127 ("Discovery Order").) Ms. Mothershed had argued for a longer timeframe: for the entire 10-year statute-of-limitations period, which began on March 8, 2012, plus three additional years, through the filing date of the first motion to compel. (*See id.* at 3.) The Court found, however, that Ms. Mothershed had not met her burden to show the relevance and proportionality of discovery for that 13-year period. (*Id.* at 6–9.) The Court advised the parties that if discovery produced by Mayo indicated that fraudulent billing practices could be plausibly alleged to have existed before November 1, 2018, Ms. Mothershed could seek to expand the temporal scope of discovery. (*Id.* at 9.)

The Court also limited the substantive scope of discovery. For the alleged scheme of upcoding non-emergency transports to emergency transports, the Court did not limit discovery to hospital-to-hospital transports, as Mayo requested, but allowed Ms. Mothershed discovery of all upcoded emergency claims. (*Id.* at 12.) The Court based this scope on a finding that the SAC alleged a broad scheme of emergency upcoding that was supported by specific examples. (*Id.*) For the alleged ALS-upcoding scheme, however, the SAC provided only two representative examples, with no allegations to support a broader fraudulent scheme. (*Id.* at 13.) The Court therefore limited the scope of ALS-upcoding discovery to instances where Mayo billed for an ALS service when an EMT-Basic assessed the patient *and* neither an ALS assessment nor an ALS intervention was performed, because that was the situation described in the two representative examples. (*Id.*)

### C.    Ms. Mothershed's Current Motion to Compel

Ms. Mothershed argues that discovery provided by Mayo and through witness testimony shows that Mayo's coding practices remained the same over time and that the discovery is "consistent with" her ALS-upcoding and emergency-upcoding theories. (Pl.-Relator's Mem. at 2–5, Dkt. No. 135.) She therefore asks the Court to expand both the temporal scope and the substantive scope of discovery. Ms. Mothershed also moves to compel information about 138 transports billed as ALS, even though there was no advanced care administered or indication at the time of the call that the patient needed advanced care. (*Id.* at 10–12, 13–14.) Lastly, she asks the Court to compel an audit of government claims Mayo undertook in either 2021–2022 or 2023. (*Id.* at 14–18.)

5

Mayo opposes Ms. Mothershed's motion, contending she has not shown the requested discovery to be relevant or proportional to the allegations in the SAC. (Def.'s Mem. Opp'n at 18, 20, Dkt. No. 141.) Mayo argues that some of the requested discovery relates to a new theory of fraudulent billing that is not alleged in the SAC. (*Id.* at 20–22.) As to the existing schemes, Mayo contends that Ms. Mothershed has not come forth with evidence of fraud outside of the previously determined relevant timeframe of November 1, 2018 to March 8, 2022, and thus the temporal scope of discovery should not be expanded. (*Id.* at 27.)

## II.    Legal Standards

Federal Rule of Civil Procedure 26(b)(1) defines the scope of discovery. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In determining proportionality, courts may consider several factors, including "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

If a party believes that the opposing party has failed to respond to discovery or served insufficient responses, it may "move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). The moving party must make a threshold showing of relevance. *Sherman v. Sheffield Fin., LLC*, 338 F.R.D. 247, 252 (D. Minn. 2021). Once relevance is shown, the burden then shifts to the opposing party to show that the discovery

is not relevant or is unduly burdensome. *Patterson Dental Supply, Inc. v. Pace*, No. 19-CV-1940 (JNE/LIB), 2020 WL 10223625, at *20 (D. Minn. June 17, 2020).

## III. Discussion

### A. Temporal Scope

Ms. Mothershed asks the Court to extend the temporal scope of discovery back to March 8, 2012 (consistent with the statute of limitations) and forward to April 29, 2024 (when this case was unsealed). (Pl.-Relator's Mem. at 20–21.) Mayo opposes any modification to the temporal scope.

As the Court explained in its order on Ms. Mothershed's first motion to compel, the nature of a False Claims Act ("FCA") case provides context for relevance and proportionality. "The *qui tam* provisions of the FCA . . . authorize private citizens (called relators) to sue on behalf of the government and, as a bounty, share in any recovery." *United States ex rel. Newell v. City of St. Paul*, 728 F.3d 791, 794 (8th Cir. 2013). A "continuing conundrum in *qui tam* cases" is determining how wide a relator's insider knowledge should open the door to discovery, while preventing a "roving commission" into the defendant's billing practices. *United States ex rel. Grandeau v. Cancer Treatment Ctrs. of Am.*, No. 99-C-8287, 2003 WL 21504998, at *2 (N.D. Ill. June 30, 2003). In setting the temporal scope of discovery, courts should be mindful not to dissuade whistleblowing by, for example, limiting discovery to the relator's duration of employment, *see Fiederer v. Healing Hearts Home Care, Inc.*, No. 2:13-CV-1848-APG-VCF, 2014 WL 4666531, at *5 (D. Nev. Sept. 18, 2014), but must nonetheless guard against broad inquiries into other time periods that do not "hew closely to matters specifically described in the complaint,"

7

*United States ex rel. Dicken v. Northwest Eye Clinic, P.A.*, No. 13-CV-2691 (JNE/KMM), 2018 WL 2980394, at *2 (D. Minn. June 14, 2018) (quotation omitted). A complaint's cursory or superficial references to ongoing or systemic fraud do not warrant discovery of fraudulent claims for an extended period. *United States ex rel. Spay v. CVS Caremark Corp.*, No. 09-CV-4672, 2013 WL 4525226, at *2–4 (E.D. Pa. Aug. 27, 2013).

With this context in mind, the Court turns to the motion to compel. Ms. Mothershed first argues that paragraphs 43, 56, 120, and 123 of the SAC contain allegations showing that data going back to 2013 support an expanded timeframe for discovery. (Pl.-Relator's Mem. at 21.) Ms. Mothershed notes, for example, that Mayo was reimbursed for a similar number of emergent-advanced claims in 2013 (9,668 claims) and in 2018 (9,436 claims). (Pl.-Relator's Mem. at 21.)

Ms. Mothershed made these arguments in her first motion to compel, and the Court was not persuaded by them. (Discovery Order at 7–9.) The Court declines to reconsider its earlier ruling rejecting those arguments. The conclusions Ms. Mothershed draws from the data remain speculative, and Ms. Mothershed has not identified any evidence of "*specific* services, practices, or billing activities that correspond with the years" 2013 or 2018. (*See* Discovery Order at 7) (emphasis in original).) "[R]ote allegations of 'ongoing' illegal activity, unaccompanied by allegations of specific instances of wrongdoing, are insufficient to justify discovery beyond the time period during which specific instances of wrongdoing have been alleged." *United States ex rel. Bilotta v. Novartis Pharms. Corp.*, No. 11-CV-0071 (PGG), 2015 WL 13649823, at *3 (S.D.N.Y. July 29, 2015) (citing cases).

Ms. Mothershed next cites deposition testimony from two Mayo billing specialists that "their approaches to reviewing claims for emergent and advanced designations have not materially changed over time." (Pl.-Relator's Mem. at 21.) Billing specialist Tessa Leutink testified that in the 24 years she has worked at Mayo, Mayo has not changed how it bills for emergent transports or ALS transports. (Bailey Decl. Ex. F (Leutink Dep. at 10, 60), Dkt. No. 136-6.) Previous billing specialist Julie Mickow testified that Mayo has not changed its ALS/BLS or emergent/non-emergent coding practices in the nearly 30 years that she has worked there. (Bailey Decl. Ex. G (Mickow Dep. at 48–49, 145–46), Dkt. No. 136-7.) Ms. Mothershed did not identify testimony from either individual, however, that Mayo's billing or coding practices were fraudulent. To the contrary, Ms. Leutink testified that she has never thought Mayo billed a transport as ALS when it should have been billed as BLS. (Leutink Dep. at 60.) The Court finds the witnesses' testimony does not support an expansion of the temporal scope of discovery.

Ms. Mothershed next points out that Mayo's non-emergent coding criteria and coding flowchart remained consistent dating back to 2013 and 2006, respectively. The Court is not persuaded by this consistency. Evidence of consistent practices or guidelines, without more, does not warrant expanding the temporal scope of discovery. Ms. Mothershed has not identified anything legally noncompliant, much less fraudulent, with the coding criteria or flowchart.

Acknowledging Mayo's argument that her evidence of consistency may be sparse, Ms. Mothershed says that Mayo complied strictly with the Court's established timeframe for discovery, which prevented her from learning about practices before and after the

relevant time period. (Pl.-Relator's Mem. at 21–22.) This argument would be more persuasive if Ms. Mothershed had identified specific examples of fraudulent billing between November 1, 2018 and November 1, 2020—the two-year period before she started working at Mayo—from the discovery Mayo produced. Ms. Mothershed's failure to provide evidence of fraud during the already expanded timeframe weighs against her request to expand it further.

The Court agrees with Ms. Mothershed that she need not prove fraud in order to obtain discovery (*see* Pl.-Relator's Mem. at 22), but the Court anticipated she would have come forth with additional, specific examples of improper billing practices from the information she obtained during discovery. Instead, Ms. Mothershed offers more general and speculative conclusions. For example, she states that Mayo billed 21,500 hospital-to-hospital runs as emergent during the current temporal scope and that Mayo took more than 15 minutes to dispatch an ambulance in 12,000 runs billed as emergent. (Pl.-Relator's Mem. at 3.) Ms. Mothershed does not explain, however, how these practices constituted false billing practices. She does not show that hospital-to-hospital transports are necessarily non-emergent, nor does she identify a time-based requirement for ambulance dispatches that is established by law, regulation, or CMS guidance.

Ms. Mothershed's legal authority is also unpersuasive. She cites several cases for the proposition that discovery beyond the specific instances of misconduct alleged in the complaint should be allowed: *United States ex rel. Everest Principals, LLC v. Abbott Laboratories*, No. 3:20-CV-00286-W-MSB, 2024 WL 304082 (S.D. Cal. Jan. 26, 2024); *United States ex rel. Brooks v. Stevens-Henager College, Inc.*, No. 2:15-CV-00119-JNP-

EJF, 2018 WL 296088 (D. Utah Jan. 4, 2018); and *Dalitz v. AmSurg Corp.*, No. 2:12-CV-2218-TLN-CKD, 2015 WL 8717398 (E.D. Cal. Dec. 15, 2015). (Pl.-Relator's Mem. at 23.) All three cases considered the complaint's allegations and whether the complaint plausibly alleged a broader policy and practice than the specific instances described therein. *See Everest Principals*, 2024 WL 304082, at *4; *Brooks*, 2018 WL 296088, at *5; *Dalitz*, 2015 WL 8717398, at *4. This Court has already considered the SAC's allegations and whether the SAC alleged a broader policy or practice than the representative examples. It is not necessary to belabor that analysis again. The Court is not inclined to grant Ms. Mothershed a do-over.

The Court advised Ms. Mothershed in the Discovery Order that if information produced by Mayo indicated that fraudulent billing practices existed before November 1, 2018, she could seek to expand the temporal scope of discovery. Because Ms. Mothershed has not come forth with such information for the time period preceding that date or after March 8, 2022, the temporal scope of discovery will not be expanded.

### B.    Substantive Scope of ALS-Upcoding Discovery

Ms. Mothershed seeks the production of ALS billing and PCR records for transports that were coded as ALS-emergent even though (1) the crew performed no advanced interventions and (2) the dispatch records lacked an advanced ProQA code. (Pl.-Relator's Mem. at 10, 24–25.) Ms. Mothershed states that discovery produced by Mayo relevant to the emergency-upcoding scheme revealed 138 ambulance transports that were billed as ALS without an advanced ProQA code in the dispatch records. (*Id.* at 25, 27.) This

11

discovery, according to Ms. Mothershed, warrants expanding the scope of discovery for the ALS-upcoding scheme.

The Court disagrees. In setting the substantive scope of discovery for Ms. Mothershed's first motion to compel, the Court again looked to the allegations in the SAC. For the emergency-upcoding theory, the SAC alleged three specific examples involving hospital-to-hospital transports, as well as details of a broader scheme. (Discovery Order at 11–12.) Thus, the Court allowed discovery into the larger alleged scheme of upcoding non-emergency transports to emergency. (*Id.* at 12.) For the ALS-upcoding theory, however, there were two specific examples, but no detailed allegations to support a broader fraudulent theme. (*Id.* at 13.) The only two specific examples of ALS upcoding described situations where an EMT-Basic assessed the patient and neither an ALS assessment nor an ALS intervention was performed. (*Id.*) Thus, the substantive scope for ALS-upcoding discovery was limited to similar situations.

Ms. Mothershed contends that her ALS-upcoding theory is pleaded broadly enough to justify the additional discovery. Broad allegations alone, however, do not open the door to discovery. In the first round of discovery motion practice, the Court permitted discovery into the larger fraudulent scheme of upcoding non-emergency transports to emergency because the SAC "describes a general fact pattern of alleged fraudulent behavior supported by specific examples of that behavior." (Discovery Order at 12 (quoting *United States ex rel. McCartor v. Rolls-Royce Corp.*, No. 1:08-CV-00133-WTL, 2013 WL 5348536, at *6 (S.D. Ind. Sept. 24, 2013); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007) (holding "where a relator pleads a complex and far-reaching

fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme")).) The SAC lacks any specific examples of Ms. Mothershed's new ALS-upcoding theory. The Court has assessed relevance and proportionality according to the allegations in the SAC and finds no good reason to deviate from that now.

Even if the Court were to agree with Ms. Mothershed that the dispatch records produced by Mayo *could* open the door to expanded discovery, she has not provided specific examples of this new fraudulent theory from the existing discovery. She has not shown that the 138 transports were billed unlawfully. She has not explained why the lack of a ProQA code automatically means that an ALS claim was billed incorrectly. And vague phrases like "problematic billing decisions" and "discovery has revealed issues" (Pl.-Relator's Mem. at 25) are not convincing. Ms. Mothershed's request to expand the substantive scope of discovery is denied.

### C.    Request for Production No. 35

In Request for Production No. 35, Ms. Mothershed asks Mayo to produce documents and communications "related to Mayo's decision to not bill government healthcare payors at ALS rates for ambulance transports with no ProQA code and no ALS treatments/interventions." (Bailey Decl. Ex. A at 2, Dkt. No. 136-1.) This discovery is related to Ms. Mothershed's new ALS-upcoding theory discussed in Part III.B above. The Court finds that the information requested in Request for Production 35 is neither relevant nor proportional for the same reasons.

### D.  Requests for Production No. 32–34

In Requests for Production No. 32–34, Ms. Mothershed asks for documents and communications concerning Mayo's decision to audit all claims related to government payors. (Pl.-Relator's Mem. at 29.) Mayo's corporate designee Thomas Fennell testified that the audit occurred in late 2021 to early 2022. (Bailey Decl. Ex. C (Mayo Dep. at 154), Dkt. No. 136-3.) He further testified that the purpose of the audit was to assure that Mayo's processes were "solid" and that the review was terminated when the results validated that they were. (*Id.* at 154–56.) Ms. Mothershed argues that the documents are relevant to understand the purpose and results of the audit and because the audit pertains to part of the relevant timeframe in this case. (Pl.-Relator's Mem. at 30.) In response, Mayo represents through its counsel's declaration that it has "conducted a reasonable search for documents evidencing the audit" and "could not find any document referencing the audit prior to February 2023." (Dougherty Decl. ¶ 21, Dkt. No. 143.) Mayo also contends that the audit is irrelevant because it is not related to the false billing allegations alleged in this case. (Def.'s Mem. at 32.)

The Court cannot reach a definitive conclusion from the existing record about when the audit occurred. Mr. Fennell testified that the audit occurred in late 2021 to early 2022, which would fall within the relevant timeframe. Mayo's representation—that it "could not find any document referencing the audit prior to February 2023"—does not conclusively establish that the audit itself did not span late 2021 to early 2022. Mayo also cites witness testimony supposedly establishing that the audit began after the relevant period. (Def.'s Mem. at 32 (citing Dougherty Decl. Ex. 5 (Mickow Dep. at 148), Dkt. No. 143-5; Ex. 6

(Leutink Dep. at 68–69), Dkt. No. 143-6; Ex. 7 (Albritton Dep. at 85–86), Dkt. No. 143-7).) But review of that testimony does not establish the timing of the audit. There are no years identified, and references to "Erin Dobb" as the supervisor and to "Marybeth" as the senior manager at the time of the audit mean nothing to the Court. Although Ms. Mickow testified that Ms. Mothershed was no longer working at Mayo when the audit occurred, the Court is hesitant to base a finding on that testimony alone.

As to relevance, the Court finds that responsive documents could be relevant, if the audit occurred in late 2021 through early 2022. That would fall within the temporal scope of discovery. Communications or reports related to the reason for the audit, why the audit was discontinued, and the "progress" of the audit could be relevant to the fraudulent billing schemes alleged in this case.

Under the circumstances, the Court will order Mayo to search for all nonprivileged documents responsive to Document Requests No. 32, 33, and 34, and provide the documents to its counsel for review. Within 30 days of the date of this Order, counsel shall file a supplemental declaration specifying the dates of the audit, which should be clear from the documents.

Accordingly, based on all of the files, records, and proceedings here, **IT IS HEREBY ORDERED** that Plaintiff-Relator Ashley Mothershed's Second Motion to

Compel Documents (Dkt. No. 133) is **DENIED in part** and remains **UNDER ADVISEMENT in part**.


Dated: July 27, 2026                          *s/ John F. Docherty*
                                              JOHN F. DOCHERTY
                                              United States Magistrate Judge